# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TYLER DIVISION

| | | |
|---|---|---|
| EMG TECHNOLOGY, LLC, § § § Plaintiff, § § vs. § **CASE NO. 6:10-CV-536** § DR. PEPPER SNAPPLE GROUP, INC., et § al., § § Defendants. § § | | |
| EMG TECHNOLOGY, LLC, § § § Plaintiff, § § vs. § **CASE NO. 6:11-CV-488** § RADIO SHACK CORPORATION, et al., § § Defendants. § § | | |

## MEMORANDUM OPINION AND ORDER

This Memorandum Opinion construes the disputed claim terms in U.S. Patent No. 7,441,196 ("the '196 Patent"). Further, it addresses Defendants' Motion for Summary Judgment (6:11-cv-488 Docket No. 183), which is **DENIED**.

### BACKGROUND

On October 8, 2010, EMG Technology, LLC ("EMG") filed suit against Dr. Pepper Snapple Group, Inc.; Time, Inc.; McDonald's Corporation; Wal-Mart Stores, Inc.; U.S. Bancorp; Aflac Incorporated; Domino's Pizza, Inc.; The Progressive Corporation; Burger King Holdings,

Inc.; and TD Ameritrade Holding Corporation.[1] 6:10-cv-536, Docket No. 1. On September 14, 2011, EMG filed suit against Radio Shack Corporation; Ford Motor Company; The Allstate Corporation; Aetna, Inc.; Avis Budget Group, Inc.; Tiffany & Co.; Kohl's Corporation; Dick's Sporting Goods, Inc.; T. Rowe Price Group, Inc.; Liberty Mutual Holding Company, Inc.; SunTrust Banks, Inc.; MetLife, Inc.; and The Dun & Bradstreet Corporation.[2] 6:11-cv-488, Docket No. 1. Both suits involve allegations that the Defendants[3] infringe U.S. Patent No. 7,441,196 entitled "Apparatus and Method of Manipulating a Region on a Wireless Device Screen for Viewing, Zooming and Scrolling Internet Content." The earlier-filed suit also alleged infringement of U.S. Patent No. 7,020,845 ("the '845 Patent"), a related patent. However, the case has been stayed regarding the '845 Patent pending reexamination. *See* 6:10-cv-536 Docket No. 288. On March 29, 2012, the Court conducted a *Markman* hearing on the disputed '196 Patent claim terms. All disputed terms presented below are used in claims 25, 28, 29, 35, 57, 58, 59, 61, 67, 68, and 71 of the '196 Patent.

## APPLICABLE LAW

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). In claim construction, courts examine the patent's intrinsic evidence to define the patented invention's scope. *See id.*; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). This intrinsic evidence includes

---

[1] Only The Traveler's Indemnity Company (added via amended complaint) remains in the suit at this time.
[2] Only Radio Shack Corporation; Aetna, Inc.; Avis Budget Group, Inc.; and The Dun & Bradstreet Corporation remain in the suit at this time.
[3] Defendants shall be used to denote the remaining defendants in both cases.

the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id.* Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *see also Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id.* Also, the specification may resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone."

*Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition is entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

Defendants also contend that some claims at issue are invalid for indefiniteness. A claim is invalid under 35 U.S.C. § 112 ¶ 2 if it fails to particularly point out and distinctly claim the subject matter that the applicant regards as the invention. The party seeking to invalidate a claim

under 35 U.S.C. § 112 ¶ 2 as indefinite must show by clear and convincing evidence that one skilled in the art would not understand the scope of the claim when read in light of the specification. *Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*, 336 F.3d 1308, 1319 (Fed. Cir. 2003).

## CLAIM TERMS

**webpage**

EMG proposes "a document on the world wide web." Defendants propose "a page with a URL on the world wide web."

Prior to the *Markman* hearing, Defendants altered their proposal to "a document with a URL on the world wide web." *See* Tr. *Markman* Hr'g 71, Mar. 29, 2012. Thus, the only remaining dispute at the hearing was whether a document on the world wide web had a URL. The parties ultimately agreed that a document on the world wide web has a URL. *See id.* at 77–78. The parties also agreed that the limitation was not required in the construction because it would only confuse the jurors. *Id.* Having resolved the URL dispute, the parties effectively agreed that EMG's proposed construction was appropriate. *Id.*

Accordingly, the Court construes webpage as "a document on the world wide web" and further clarifies that a document on the world wide web has a URL.

**sister site**

EMG proposes "a website that is related to another website." Defendants propose "website that is related to a webpage and is at a discrete location from the webpage." The parties agree that a sister site is a website. Further, the parties agreed at the *Markman* hearing that a website is one or more webpages. Tr. *Markman* Hr'g 30–33, Mar. 29, 2012. The parties dispute (1) whether a sister site relates to a webpage or website and (2) whether the sister site is at a discrete location from the related website or webpage.

5

*Webpage vs. Website*

EMG argues that construing a sister site as relating to a webpage as opposed to a website misrepresents the context of the invention and would confuse the jury. EMG contends that the specification supports that a sister site is related to a website. *See* '196 Patent col. 2:56–57 ("Content partners may maintain a database of sister site web pages corresponding to the pages in the general use site."). Further, EMG argues that the term sister site itself implies that it is related to a site rather than a page.

Defendants note that the claims discuss sister site in terms of webpages, not websites. Thus, Defendants argue, a jury would be confused if sister site was related to a website, which is not mentioned in the claim language. Defendants further contend that EMG's statements during the prosecution of the related '845 Patent support their argument that a sister site is associated with a webpage: "[o]ne of ordinary skill in the art reading the claim in light of the specification would understand that the term 'sister site' refers to a document or application located on a network, including the Internet, that is related to the webpage that it is associated with." 6:10-cv-536 Docket No. 286 attach. 6, at 12 ('845 Prosecution History).

The specification indicates that a sister site is related to a website: "In one embodiment, the sister site is traditional HTML *pages* converted to a matrix format to permit matrix navigation." '196 Patent col. 2:52–54 (emphasis added). Further, as EMG highlighted, the specification envisions storing "sister site web pages corresponding to the pages in [a] general use site." *Id.* col. 2:56–57. Thus, a set of sister site webpages corresponds to a set of traditional site webpages. While a sister site may correspond to a webpage in the event that a website contains only a single webpage, a sister site should not always be so limited. One of skill in the art would understand a sister site, by its plain language and in light of the specification, to correspond to a website, which may contain one or more webpages.

*Discrete Location*

Defendants seek to further limit a sister site to a website that is at a discrete location from its corresponding website based on the following statement from the prosecution history of the related '845 Patent: "a 'sister site' implies that it is a discrete location from the site with which it is a 'sister.'" 6:10-cv-536 Docket No. 286 attach. 3, at 12. The next statement provides context: "Thus, the navigation graph of Dolan cannot be characterized as a site or a sister site as it is not a site on a network itself, but rather a graphical representation of data in a navigation file." *Id.* at 12–13. These statements were made to distinguish Dolan, which involved a locally stored navigation file for a webpage or website. *See id.* at 12.

In distinguishing Dolan, EMG argued that Dolan failed to teach a sister site because the related navigation file was merely a locally stored file and thus not at a discrete location on the network. Thus, a sister site must be a site located on the network as opposed to a file that may only be accessed locally. Defendants do not dispute that a sister site is located on the network. Adding the "discrete location" limitation without further context would only confuse the issue. To the extent that Defendants argue that discrete location means that a sister site must be separate from its related site, "related to *another* website" conveys this idea clearly and succinctly.

For these reasons, the Court construes "sister site" as "a website that is related to another website."

**unique input**

EMG proposes "a single input that is sufficient to activate a single navigation option." Defendants propose "a separate input that actuates only one navigation option and that does not change function based on its position or movement relative to the screen."

The primary dispute between the parties pertains to the latter portion of Defendants' proposal: "that does not change function based on its position or movement relative to the screen." Defendants provide two reasons for the "no changed function" limitation. Defendants first contend that EMG's arguments to the U.S. Patent and Trademark Office ("PTO") distinguishing the Kaplan reference disavowed touchscreens. Defendants next contend that EMG's arguments to the PTO that the claims-at-issue do not cover mouse input devices also excludes touchscreens from their purview. EMG counters that it did not clearly disavow touchscreens during prosecution of the related patent applications.[4] EMG also argues that, while the claims do not cover mouse input devices, they do cover touchscreen devices.

When prosecuting a related patent—U.S. Patent No. 7,194,698 ("the '698 Patent")—the PTO initially rejected a set of claims based on the Kaplan reference. 6:10-cv-536 Docket No. 286 attach. 8. Original claim 39 of the '698 Patent application, which is representative of the claims that were rejected, covered: "A method comprising: generating a simplified navigation interface for web content; and displaying an advertisement through the simplified navigation interface, the advertisement to be selected based on the interaction of the user with the simplified navigation interface." 6:10-cv-536 Docket No. 286 attach. 7, at 5. The examiner found that "Kaplan teaches a method comprising generating a simplified navigation interface for web content and displaying an advertisement through the simplified navigation interface, the advertisement to be selected based on the interaction of the user with the simplified interface." 6:10-cv-536 Docket No. 286 attach. 8, at 3 (citations omitted). Thereafter, EMG had an interview with the examiner to discuss the rejected claims. The interview was summarized as follows: "The examiner and applicant discussed language for the claims to further describe that

---

[4] The prosecution history at issue specifically relates to parent or grandparent applications of the '196 Patent, but both parties agree that it is applicable for interpreting the '196 Patent.

the navigation interface comprises a plurality of cells arranged in a grid-like structure having a one to one mapping unique to a key press and wherein data is automatically displayed based on a user's selection history log." 6:10-cv-536 Docket No. 286 attach. 10. Thereafter, claim 39 was replaced with new claim 105, stating: "A method for interactive navigation comprising: displaying one or more advertisements on a display; receiving a user selection of a displayed advertisement; and displaying content accessed via the internet, wherein the displayed content is associated with the selected advertisement, and wherein the content accessed via the internet is formatted for navigation with unique inputs." Docket No. 286 attach. 11.

Neither the examiner nor the language of new claim 105 mentions touchscreens. Rather, the examiner focused on the fact that Kaplan taught a simplified navigation interface. At the interview, the applicant and examiner discussed new claim language to further limit the simplified navigation interface. New claim 105 clarified that the accessed content was "formatted for navigation with unique inputs." *Id.* EMG did not clearly disavow touchscreens; rather, it defined and limited the simplified navigation interface of the original claim 39.

EMG's introduction of "unique inputs" to distinguish Kaplan did make clear that unique inputs require a one-to-one mapping between the user input and the associated content. In its response submitting new claim 105 for consideration, EMG stated that "[c]ontent that is formatted for navigation with unique inputs has a *one-to-one unique mapping* to an input." 6:10-cv-536 Docket No. 280 attach. 13, at 14. Thus, there is a one-to-one mapping between a unique input and the content it is associated with. EMG's proposed construction, which only requires "a single input that is sufficient to activate a single navigation option," fails to capture this one-to-one mapping. The input must activate "only one" navigation option. The language of Defendants' proposed construction captures this requirement.

Defendants also argue that arguments made to the PTO disavowing mouse input devices necessarily disavowed touchscreens. When prosecuting U.S. Patent No. 6,600,497 ("the '497 Patent")[5], EMG explained that a mouse selection (i.e., using a mouse to select items on a screen) is not a unique input because "[a] mouse click is still a mouse click regardless of where positioned." 6:10-cv-536 Docket No. 280 attach. 15, at 4. Defendants argue that a mouse click and a touch on a touchscreen are essentially identical. However, a mouse click does not convey location; rather, the optical tracking light or trackball on the mouse conveys movement information for determining relative cursor location. A touch on a touchscreen is different; it simultaneously conveys the touch and the location of the touch. Thus, EMG's arguments that a mouse click is not a unique input do not disavow touchscreens as unique inputs. Because EMG has not disavowed touchscreens, Defendants' proposed no changed function limitation is not appropriate.

For these reasons, the Court construes "unique input" as "a separate input that actuates only one navigation option."

**the [first/online] content reformatted from a web page in a hypertext markup language (HTML) format into an extensible markup language (XML) format to generate a sister site**

EMG proposes that no construction is necessary apart from construing the terms "webpage" and "sister site." Defendants propose "generating a sister site by converting the format of [first/on-line] content on a web page from hypertext markup language (HTML) format to extensible markup language (XML) format."

Defendants argue that "converting" is more understandable than "reformatting." Defendants cite a preferred embodiment description that uses the term "converting" to describe the reformatting from HTML to XML. *See* '196 Patent col. 2:52–59. However, the specification

---

[5] The '497 Patent is a grandparent to the '196 Patent.

uses several terms to convey that the web page in HTML format is reformatted to an XML format. *See, e.g.*, *id.* col. 3:21–37 (using the terms conversion, transcoded, reformatted, and applying a cascading style sheet to describe how HTML content is reformatted to XML). These terms would be understood by one of skill in the art to convey similar concepts. The claim language itself is clear, and Defendants proposed substitution of "convert" for "reformat" reflects a preference rather than an attempt to clarify. Further, Defendants' proposed reordering of the claim language is without basis. Their proposal is no more clear than the original language and, again, merely reflects preference.

For these reasons, this term does not require construction.

**displayed in a form of a two-dimensional layer of cells**

EMG proposes that no construction is necessary. Defendants propose "displayed in cells arranged in rows and columns." Defendants argue that a two-dimensional layer of cells is comprised of rows and columns. Defendants also oppose a construction that permits a single row or column of cells to meet the two-dimensional layer of cells limitation. EMG objects because Defendants' proposal incorporates a "rows and columns" limitation that is not present in the claims. Further, EMG objects to Defendants' suggestion that the proposed "rows and columns" must be evenly distributed.

Defendants implied at the *Markman* hearing that rows and columns must be evenly distributed (i.e., every row must have the same number of columns and vice versa). *See* Tr. *Markman* Hr'g 82, Mar. 29, 2012 (indicating that Figure 14 "has a two-dimensional layer of cells *in it*" (emphasis added)); *id.* (indicating that, in Figure 8, all cells are part of a two-dimensional layer). "Two-dimensional layer of cells" does not require evenly distributed rows and columns, as Defendants suggest. Further, EMG made clear at the *Markman* hearing that it was not taking the position that a single column or single row of cells meets the "two-dimensional layer of

cells" limitation. *Id.* at 80. The rows and columns limitations proposed by Defendants are not supported by the claim language or specification.

For these reasons, this term does not require construction.

**manipulating a [region/selected region] of the screen for viewing and zooming and/or scrolling of the displayed on-line content**

EMG proposes that no construction is necessary. Defendants propose "viewing and zooming and/or scrolling only a portion of the screen containing the displayed on-line content." The primary dispute between the parties is whether a region can encompass the entire screen or must only be a portion of the screen.

EMG contends that a region may cover either a portion of the screen or the entire screen. EMG argues that the specification envisions a region that covers the entire screen. *See* '196 Patent col. 6:25–27 ("It is also within the scope of the invention to permit a user to increase the zoom of the focus region to exceed the physical [screen] space."). Finally, EMG contends that claim differentiation requires a construction that permits the manipulating limitation to apply to the screen rather than a selected region, pointing to claims 54 and 56. Claim 54, which depends from claim 25, states that "the screen includes individual regions adapted to be brought into focus and further adapted such that the on-line content can be manipulated within a selected one of the regions." *Id.* col. 14:38–41. Claim 56, which depends from claim 54, states that "the focused one of the regions is adapted to be zoomed and/or scrolled independently of other ones of the regions." *Id.* col. 14:46–48. EMG argues that claims 54 and 56 limit the manipulation to a portion of the screen; therefore, claim 25 should not be so limited.

Defendants respond that all of the preferred embodiments disclosed in the specification reveal situations where the screen is subdivided into regions. *See, e.g.*, *id.* cols. 3:2–11 (discussing how a page is segmented into multiple regions). Regarding claim differentiation,

Defendants argue that claims 54 and 56 do not specify that a region is only a portion of the screen and thus do not support EMG's arguments that a region can encompass the entire screen.

The invention permits navigation of traditional webpages on non-traditional devices with limited screen real estate. *See id.* col. 1:43–47 (summarizing the invention). This is done, in part, by dividing the screen into regions for manipulation (e.g., viewing, zooming, or scrolling). *See id.* cols. 2:61–3:11 (describing the mode and purpose of segmentation). Thus, a region may be a portion of a screen. The specification and claims, however, do not limit a region to only a portion of the screen. Claim 58 is instructive and states in relevant part:

> A machine readable medium having instructions stored therein, which when executed cause a machine to perform a set of operations comprising:
>
> displaying on-line content accessed via the Internet . . . ;
>
> receiving a user selection of one of the navigation options;
>
> forwarding the selected navigation option across the internet to a server providing the simplified navigation interface;
>
> receiving a next deeper navigation layer of the simplified navigation interface corresponding to the selected navigation option; and
>
> manipulating a region of the screen for viewing and zooming and/or scrolling of the displayed on-line content.

*Id.* cols. 14:54–15:17. The claim covers displaying content, presumably on the screen, and also manipulating a region of the screen for viewing, zooming, or scrolling. The claim does not limit the region for manipulation to only a part of the screen. The specification reveals an architecture where users can drill down from general, high-level content to specific, detailed content. *See id.* col. 7:46–49. Accordingly, the "final" level of detail may yield a region of on-line content for manipulation (i.e., viewing, zooming, or scrolling) that covers the entire screen. Accordingly, a region is not limited, as Defendants suggest, to a portion of the screen, and Defendants' proposed construction is overly limiting.

For these reasons, the term does not require construction.

**simplified navigation interface**

Defendants argue that the term "simplified navigation interface" is indefinite under § 112 ¶ 2. *See* 6:11-cv-488 Docket No. 183 (motion for summary judgment). EMG argues that the term is amenable to construction and proposes "an interface that simplifies navigation of a web page and is provided by a sister site." At the *Markman* hearing, Defendants provided the following proposal in the event the Court finds the term amenable to construction: "an interface through which the content of the web page is divided into separate regions and displayed by a sister site so that the user can first select a region to focus on and then select a link within that region to actuate." Tr. *Markman* Hr'g 15, Mar. 29, 2012.

Defendants contend that "simplified navigation interface" is a subjective term and is not amenable to construction because it lacks an objective basis for interpretation. Defendants highlight that EMG admitted the term is a relative one during reexamination of the '196 Patent. *See* 6:11-cv-488 Docket No. 183 attach. 5, at 6 ("As a term of degree, the terminology 'simplified' is relative claim terminology."). Defendants argue that there is no objective standard for measuring whether a navigation interface is *simplified*.

EMG first argues that the Board of Patent Appeals and Interferences ("BPAI") inherently considered this issue when it reversed the PTO's finding that the '845 Patent application was obvious. EMG also contends that the plain language of the claims, in light of the specification, provide sufficient meaning for the term "simplified navigation interface." EMG notes that the specification gives examples of a simplified navigation interface: Figure 2A shows a traditional web page and Figure 2B shows a simplified navigation interface for that site. *See also* '196 Patent col. 2:49–52 ("As used herein, 'sister site' is deemed to mean a site that provides for navigation of the site using a simplified navigation system, *such as matrix navigation described in more detail below*." (emphasis added)).

As the BPAI recognized, the navigation interface is simplified with respect to the original webpage or website for which the sister site was created. *See* 6:11-cv-488 Docket No. 183 attach. 15, at 9 ("[T]he claim does require that the sister site provides the simplified navigation interface *for the web page*." (emphasis added)). Defendants argue that, even given this frame of reference, the term is subjective and one user's notion of "simplified" may be different from another user's. However, the claims themselves provide the requisite guidance for determining whether a related interface for a webpage or website is a "simplified navigation interface." Claim 58 is representative and explains that "the web page [is] reformatted to be displayed and navigable through a simplified navigation interface . . . ." '196 Patent col. 14:62–63. The claim further describes the simplified navigation interface:

> . . . the simplified navigation interface displayed in a form of two-dimensional layer of cells from a plurality of layers and a plurality of cells, the two-dimensional layer in a form of navigation matrix, each cell is a division of a screen and exclusive to a separate single navigation option associated with a specific unique input, the on-line content formatted to be displayed in one or more of the plurality of cells and formatted to be selected for navigation by one or more of the unique inputs, navigation options to change between layers of the simplified navigation interface from general to more specific in each deeper layer . . . .

*Id.* cols. 14:64–15:8. Thus, the claims specifically describe the manner in which a navigation interface is simplified: (1) the interface is displayed in a two-dimensional layer of cells in a form of navigation matrix; and (2) each cell is a division of the screen and maps to a unique input. Further, the interface may be comprised of multiple layers where each child layer captures more specific information than the parent layer. As EMG explained, the specification provides examples of simplified navigation interfaces for the website shown in Figure 2A.

The instant case is different from *Datamize LLC v. Plumtree Software, Inc.*, 417 F.3d 1342 (Fed. Cir. 2005), which is cited by Defendants. There, the Federal Circuit affirmed that the term "aesthetically pleasing" used to describe the look and feel of an interface was indefinite

because the claims—though they identified the elements that were aesthetically pleasing—failed to provide guidance on what aesthetically pleasing meant. *See Datamize*, 417 F.3d at 1349, 1356. Here, the claims provide specific guidance on how a simplified navigation interface is derived from a traditional website. A simplified navigation interface is related to a specific website and is organized in a manner dictated by the language of the claims. One of skill in the art, in light of the specification and claim language, would the meaning and scope of the term "simplified navigation interface."

For these reasons, the term "simplified navigation interface" is not insolubly ambiguous. Further, the term does not require construction because the claim language itself provides sufficient context and definition for the term.

## CONCLUSION

For the foregoing reasons, the Court interprets the claim language in this case in the manner set forth above, and Defendants' Motion for Summary Judgment (6:11-cv-488 Docket No. 183) is **DENIED**. For ease of reference, the Court's claim interpretations are set forth in a table in Appendix A.

**So ORDERED and SIGNED this 7th day of August, 2012.**

_____
**LEONARD DAVIS
UNITED STATES DISTRICT JUDGE**

# APPENDIX A

| Claim Term | Court's Construction |
|---|---|
| webpage | a document on the world wide web |
| sister site | a website that is related to another website |
| unique input | a separate input that actuates only one navigation option |
| The [first/online] content reformatted from a web page in a hypertext markup language (HTML) format into an extensible markup language (XML) format to generate a sister site | No construction necessary |
| displayed in a form of a two-dimensional layer of cells | No construction necessary |
| manipulating a [region/selected region] of the screen for viewing and zooming and/or scrolling of the displayed on-line content | No construction necessary |
| simplified navigation interface | No construction necessary |